**TAMACHI, INC., Plaintiff,**

v.

**CHRYSLER PLYMOUTH de PONCE, INC., Defendant.**

**Civ. No. 86–1702 (JAF).**

United States District Court, D. Puerto Rico.

Jan. 27, 1987.

Pedro J. Santa-Sánchez, San Juan, P.R., O'Neill & Borges, Mary K. Austin, Reboul, MacMurray Hewitt, Maynard & Kristol, New York City, for plaintiff.

Josè M. González-Romanace, Ponce, P.R., Salvador Antonetti, San Juan, P.R., Fiddler Gonzalez & Rodriguez, for defendant.

**OPINION AND ORDER**

FUSTE, District Judge.

On October 30, 1986, plaintiff Tamachi, Inc., a wholly-owned subsidiary of Mitsubishi Motors Corporation of Japan, filed an action for injunctive relief, declaratory

judgment and damages pursuant to section 16 of the Clayton Act, 15 U.S.C. sec. 26, against Chrysler Plymouth de Ponce, Inc. (CPP). Tamachi primarily alleged that CPP, by demanding that its key-dealer contract be enforced as written, was inducing Tamachi to practice unlawful discrimination in pricing its products and to restrain trade in violation of federal antitrust laws, specifically 15 U.S.C. sec. 13(f) (1973) and 15 U.S.C. secs. 1–7. Tamachi also sought a declaratory judgment under the Federal Automobile Dealers' Day in Court Act, 15 U.S.C. secs. 1221–1225, or Law 75 of Puerto Rico, 10 L.P.R.A. secs. 278–278d.[1]

In mid-December, CPP filed a motion to dismiss, alleging lack of subject matter jurisdiction. It simultaneously filed suit pursuant to Law 75 in the Superior Court of Puerto Rico, Ponce Division, raising the same facts and arguments constituting the basis of the antitrust claims before us. Tamachi then filed a motion asking us to issue an order to show cause why we should not order the state court to stay the case at hand, pending our resolution of the federal case. 28 U.S.C. sec. 2283. A hearing on the matter was held January 8, 1987. Because of the seriousness of the requested injunction of a state court action, most of the oral argument was directed toward the issue of jurisdiction before this court.

Tamachi, a Puerto Rican corporation, is the sole importer and authorized distributor in Puerto Rico of Mitsubishi vehicles, parts, and accessories. Prior to establishing Tamachi, Mitsubishi dealt directly with its exclusive distributors on the island. After economic considerations made the establishment of Tamachi necessary, the former exclusive distributors became "Key Dealers" under an Agreement of Purchase and Release (the APR). CPP, one such distributor, became a Key Dealer under such an agreement signed August 31, 1982.

The concept of the Key Dealer is defined in section 6 of the APR as:

[a]ny Dealer that maintains showroom(s), spare parts, warehouse(s) and service facilities which are satisfactory to [Tamachi] and that perform such parts stocking/supplying and after-sale servicing of MMC Vehicles (whether or not sold by such Key Dealer) as are satisfactory to [Tamachi].

Additionally, under the terms of the APR, CPP's continued appointment as a Key Dealer was subject to CPP's performance of its Key Dealer responsibilities in a manner satisfactory to Tamachi.

The APR initially established a compensation to the Key Dealers of a 4% discount from the suggested retail price for each vehicle sold within the Key Dealer's trading area. This 4%, which was to compensate for the services that Tamachi would otherwise be required to perform itself, was subject to change under the terms of the APR.

Tamachi later determined that the 4% Key Dealer Margin exceeded the reasonable costs of performing after-sale servicing of Mitsubishi vehicles and associated parts stocking/supplying.[2] Accordingly, Tamachi reduced the amount of compensation provided to the Key Dealers for providing those functions. All of the Key Dealers, except for CPP and one other, agreed to and accepted the schedule of compensation reductions. The agreement also provides CPP with certain exclusive rights in designated geographic territories. That is, Tamachi agreed not to sell Mitsubishi vehicles to any dealers within CPP's designated trading areas, subject to fulfillment of certain conditions. This is also an area of contention in both suits, with Tamachi alleging that CPP did not meet the

---

1. Law 75 is known as the Dealers Act. Under the same, no principal may perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration date, except for just cause. *Warner-Lambert v. Superior Court*, 101 D.P.R. 378

(1973); *Fornaris v. The Ridge Tool Co.*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970).

2. In its complaint filed in the Superior Court, CPP alleges, among other things, that this determination was made without prior notice, unilaterally, and without just cause.

condition and CPP claiming that, if this is the case, it was because it was obstructed from doing so by Tamachi's own actions.

Tamachi states in its motion that:

> The purpose of the preliminary injunction sought by Tamachi is to maintain the status quo of the existing relationship and present course of dealing between the parties, so this Court will have a meaningful opportunity to rule upon the complex issues of federal antitrust law that constitute the principal dispute between the parties. Tamachi is not seeking to terminate CPP's dealership. Tamachi seeks only to preserve the present relationship of the parties until this action is ultimately resolved.

According to Tamachi's counsel, the status quo is not paying CPP the 4% per vehicle, but, rather, exactly what it is paying the other Key Dealers.

On the face of its complaint, its motion and memorandum to enjoin state-court proceedings, and its opposition to CPP's motion to dismiss, Tamachi presents what can only be characterized as affirmative defenses to the Law 75 suit which it anticipated and which CPP has filed in local court. In alleging antitrust claims which could possibly arise should resolution of the contract dispute go against it, Tamachi sought the jurisdiction of the federal forum, obviously in an attempt to deprive CPP of filing a local suit under Law 75. As we see it, Tamachi's clever move of suing first, would open the door to federal court to them to have the whole controversy resolved here. Such door would otherwise be closed, inasmuch as a local suit by CPP as a first filing would not be removable. 28 U.S.C. sec. 1441. Diversity jurisdiction would be lacking. 28 U.S.C. sec. 1332. We will look at each federal claim in turn.

## I.

The Automobile Dealers Day in Court Act (Automobile Dealers Act), 15 U.S.C. sec. 1222, states that:

> [a]n automobile dealer may bring suit against any automobile manufacturer engaged in commerce, ..., and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith. (Emphasis in original).

As is evident, this law creates a cause of action by David against Goliath. In the case at bar, however, Goliath requests a declaratory judgment that it is not violating this section. Tamachi states:

> As set forth in the [affidavit supporting the motion], CPP has accused Tamachi of failing to act in "good faith" and failing to treat CPP in a "fair and equitable manner" free of "coercion" or "intimidation" with respect to the APR.... CPP has therefore *implicitly claimed* that Tamachi has violated the federal Dealers' Day in Court Act. Under these circumstances Tamachi has demonstrated its entitlement to a declaratory judgment that it has not violated the Dealers' Day in Court Act. (Emphasis added).

The section of the affidavit upon which this conclusion is drawn is as follows:

> 27. CPP has consistently invoked the provisions of Paragraph 6 of the APR as the source of its rights. Among other things, CPP has contended: (i) that under the terms of the APR it is entitled to appoint and terminate its competitors and allocate vehicles to them; (ii) that it has fulfilled the terms and conditions of the APR; (iii) that Tamachi is liable for the alleged impairment of CPP's right under Act 75 of the Commonwealth of Puerto Rico, 10 L.P.R.A. section 278 *et seq.* ("Act 75"); and (iv) that Tamachi is liable to CPP for Tamachi's alleged failure to act in "good faith" and to treat CPP in a "fair and equitable manner".

At the time this suit was filed, CPP had taken no legal action and was still trying to negotiate Tamachi's compliance with what it believed to be the terms of the APR. If we may use the language of CPP's own Superior Court complaint as to where the lack of good faith lies, it was in the negotiation, not the treatment:

5. Those actions by Tamachi not only violate Law 75, but are also a violation of the exclusive contract between the parties and is a violation of the implied guaranty of good faith negotiation existing in all contractual relationships in Puerto Rico.

Moreover, we do not find that Tamachi is the Goliath at whom the statute is directed. Under 15 U.S.C. sec. 1221(a):

[T]he term "automobile manufacturer" shall mean any ... business enterprise engaged in the manufacturing or assembling of [motor vehicles] ..., including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles.

■ The Automobile Dealers Act is aimed at automobile manufacturers, not at distributors, as such, and the inclusion of distributors in the above-quoted section was designed only to prevent a manufacturer from circumventing its responsibilities under the act by transacting business with the dealers through alter egos. *Volkswagen Interamericana S.A. v. Rohlsen,* 360 F.2d 437 (1st Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966). *See also, Tom Sullivan Porsche Audi Co. v. SCU Industries,* 342 F.Supp. 738 (E.D.Mich.1972) (dealer could not recover, under this chapter, from the distributor in the absence of any indication that the distributor is controlled by the manufacturer or is its alter ego). Notwithstanding that it is a wholly-owned subsidiary, there is nothing before us to indicate that the relationship between Mitsubishi and Tamachi is such that Tamachi could be sued under the Automobile Dealers' Act.

## II.

■ The provisions of the Robinson-Patman Act relevant to Tamachi's claim, 15 U.S.C. secs. 13(a) and (f), provide in part:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

.    .    .    .    .

(f) It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

It is Tamachi's position that CPP's demand that it discount the 4% per vehicle margin, while discounting less to other Key Dealers, and nothing to non-key dealers, constitutes an inducement to discriminate in price between CPP and Tamachi's other customers, in violation of section 13(f).

Section 16 of the Clayton Act, 15 U.S.C. sec. 26, entitles a private party to sue for injunctive relief against "threatened loss or damage by a violation of the antitrust laws. The Supreme Court recently stated that a private plaintiff seeking injunctive relief under this section must demonstrate a threat of injury "of the type the antitrust laws were designed to prevent and which flows from that which makes defendant's acts unlawful." *Cargill, Inc. v. Monfort*

*of Colorado, Inc.,* —— U.S. ——, ——, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986), *citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). With the Robinson-Patman amendments, Congress sought to prevent mass distribution retailers, particularly large chain stores, from using their purchasing power to extort discriminatory concessions from their manufacturers or suppliers. *See generally,* 5 J. Von Kalmowski, *Antitrust Laws and Regulations* sec. 30.01; 80 Cong.Rec. 8111, 9419 (1936); *see also, e.g., FTC v. Henry Broch & Co.,* 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960) ("The Robinson-Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power"); *FTC v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) ("The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity-purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages...."). 

The facts in the case at bar in no way resemble the situation which this antitrust legislation sought to inhibit.

### III.

Tamachi argues that if it is forced by a court decree to discount the full 4% margin to CPP, while paying the lower margins to other Key Dealers and nothing to the non-key dealers, as well as allow CPP to appoint new dealers in the territory as required by the APR, it will be violating section 1 of the Sherman Act by contracting or conspiring in restraint of trade. Section 1 of the Sherman Act, 15 U.S.C. sec. 1, provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

Tamachi contends that such a situation could subject it to prosecution for violations of the antitrust laws, subjecting it to possible payment of treble damages.

■ We believe that Tamachi's fears are unfounded. As brought out by both parties at the hearing, in the year plus that the parties have been negotiating the points in issue, Tamachi has neither been "induced" nor acquiesced to CPP's demand for the 4% margin and the right to appoint new dealers; Tamachi is, in actuality, discounting the lower rate and has not approved any of the dealerships requested by CPP. Even if the Superior Court should order Tamachi to comply with the APR, an essential element of a Sherman Act section 1 violation is lacking. As once more pointed out by the Supreme Court, circumstances of the violation must reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), *quoting American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). We do not believe that acquiescence to a court order would fulfill this requirement.

■ As we stated earlier, this action is nothing else but a premature attack by Tamachi, fearful of CPP's expected suit in local court under the dreadful Law 75. The speculative and incidental nature of possible antitrust ramifications is such that, for reasons of comity, we hesitate to invade the province of the Puerto Rico judiciary. The motion to dismiss for lack of subject matter jurisdiction is, therefore, GRANTED.

IT IS SO ORDERED.